# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JEREMY AND ELIZABETH BAUER, MATTHEW AITKEN, LARRY POORE, and STEVEN HILL, | )<br>)<br>) |
| On behalf of themselves and all others similarly situated, | )<br>) No. 3:14-cv-1940<br>)<br>) Judge Sharp |
| Plaintiffs, | ) Magistrate Judge Holmes<br>)<br>) |
| v. | )<br>) |
| NORTEK GLOBAL HVAC LLC, NORTEK GLOBAL HVAC LATIN AMERICA, and NORTEK, INC., | )<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM

This class action was initiated by five Plaintiffs from four different states on behalf of themselves and all persons and/or entities who purchased air conditioners, air handlers and heat pumps manufactured, distributed, and sold by Defendants Nortek Global HVAC LLC, Nortek Global HVAC Latin America, Inc., and Nortek, Inc. since 2007, or who own or have owned a structure in which a Nortek Heating and Air Conditioning System has been installed since 2007.

Defendants Nortek Global HVAC LLC ("NGH" or "Nortek"),[1] Nortek Global HVAC Latin America, Inc. ("NGLA"), and Nortek, Inc. ("Nortek, Inc.," and together with NGH and NGLA, "Defendants") filed a *Motion to Dismiss Plaintiffs' Amended Complaint* (Docket Entry No. 57), to which Plaintiffs Jeremy and Elizabeth Bauer (the "Tennessee Plaintiffs"), Larry Poore (the "Florida Plaintiff"), Matthew Aitken (the "Georgia Plaintiff"), and Steven Hill (the

---

[1] Nortek Global HVAC LLC was substituted for Nordyne, LLC after the filing of the Amended Complaint. S*ee* (Docket Entry No. 54).

"Texas Plaintiff," and together with the Tennessee, Florida, and Georgia Plaintiffs, the "Plaintiffs") filed a response (Docket Entry No. 76) and Defendants filed a reply (Docket Entry No. 79).[2]  For the reasons discussed herein, the Court will grant Defendants' motion.

## **RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

Nortek Global HVAC LLC, formerly called Nordyne, Inc., is a manufacturer of heating, ventilation and air conditioning ("HVAC") equipment for residential and light commercial use in North America. Nordyne is a Delaware corporation with its headquarters in O'Fallon. Missouri.[3] Nordyne, L.L.C. is the parent company of Nordyne, Inc. Nordyne, L.L.C.'s business activities include engineering, manufacturing, assembling, marketing and distributing HVAC and related products. Its products are predominantly marketed under the various Nordyne brand names, including Broan, Frigidaire, Maytag, NuTone, Tappan, Westinghouse, Gibson, Kelvinator, Philco, Intertherm, Miller, and Mammoth. Nordyne, L.L.C. is a Delaware limited liability company with its principal place of business in O'Fallon, Missouri.  Nordyne International, Inc. engages in designing, developing, and manufacturing heating and cooling products for the HVAC market worldwide. It serves add-on, replacement, and new construction/builder markets. Nordyne International, Inc. is headquartered in Miami, Florida with manufacturing and distribution facilities in Poplar Bluff and Boonville, Missouri; and Dyersburg, Tennessee.

Plaintiffs Jeremy and Elizabeth Bauer (the "Bauers") are residents and citizens of Brentwood, Tennessee.  In June 2009, they had a new Nordyne NuTone Split Unit installed in

---

[2] Defendants have also filed a *Motion to Strike the Nationwide Class Allegations in Plaintiffs' Amended Complaint* (Docket Entry No. 46) and a *Motion to Strike State Class Allegations in Plaintiffs' Amended Complaint* (Docket Entry No. 59).  The Court will address these in sequence with the claims in the motion to dismiss.

[3] Unless otherwise noted, the allegations are drawn from Plaintiffs' Amended Complaint (Docket Entry No. 42, Am. Compl.).

their residence. Nordyne manufactured, distributed, and sold this HVAC unit under the NuTone brand name. The Bauers purchased the Nordyne Product based in part upon the ten year warranty that was offered on Nordyne NuTone HVAC systems, relying on Nordyne's warranty and advertising about the quality and longevity of its products. In early July 2009, Ms. Bauer registered the Nordyne Product pursuant to the warranty requirements for ten-year warranty coverage.

Approximately two years after its purchase, the coils in the Nordyne Product were "freezing up," making the unit unable to keep up with cooling demands (e.g., thermostat set to 74 degrees F, but the unit never cooled below 77 degrees F), though it was still running. Mr. Bauer removed the inspection cover for the coils and determined that they had frozen up and were not allowing air to flow through them. Mr. Bauer contacted the original installer of the equipment, a Nordyne dealer/installer. On July 19, 2012, the original installer discovered that the unit was low on R- 410A refrigerant. At that time, the technician performed a leak test that revealed a refrigerant leak from loose king valve caps. One pound and 8 ounces of R-410A refrigerant was added to the unit. The Bauers were charged $107.50 for the service call.

Two years later, the Bauers again experienced the same problem in July 2014. A technician determined that the evaporator coil was the location of the leak. The installer added another two pounds of refrigerant. The Bauers were charged $147.50 for the service call, and were informed that they would need to replace the evaporator coil. They were informed that Nordyne would cover only the cost of the part, but not the labor or replacement of refrigerant. On August 15, 2014, the service technicians returned to the Bauer home and replaced the defective evaporator coil and recharged the system with R-410A refrigerant. Although the part was under warranty, the Bauers were charged and paid out-of-pocket a total of $550.00 for the

cost of labor and the R-410A refrigerant. In the five years since they installed the Nordyne HVAC system in their home in June 2009, the Bauers have spent $805.00 for labor, repairs and diagnostic costs of their Nordyne Product, despite Nordyne's ten-year warranty.

Plaintiff Matthew Aitken ("Aitken") is a resident and citizen of Augusta, Georgia. In December 2008, he had a new Nordyne HVAC unit installed in his residence. Approximately four years after its purchase, the Nordyne Product stopped cooling properly. He notified the original installer of the HVAC units' failure. The repair technician found that his problem was due to defective HVAC coils (whether the installer located a leak in the evaporator coils or in the condenser coils at that time is unclear from Aitkin's service records). On July 10, 2012, a technician added "Easy Seal" to the unit and added additional R-410A refrigerant to the Nordyne Product at a cost to Mr. Aitken of $215.90.

The cooling problem reoccurred two years later. On May 12, 2014, Aitken called a technician to his home to determine why his Nordyne unit was again not cooling properly. The technician found that the refrigerant was low and added additional refrigerant to the Nordyne Product for a cost to Aitken of $239.00. A short time later, on July 1, 2014, after the same unit again failed to cool properly, another technician was called to Aitken's home to evaluate the Nordyne Product. The technician replaced the Schrader valve inside the Nordyne Product, sealed the cap and added additional refrigerant to the system, all at a cost to Mr. Aitken of $280.00. On August 8, 2014, Aitken notified Nordyne Customer Service of his repeated problems but was simply told that his unit was out of warranty and provided with a list of dealers from whom he might be available to purchase parts.

Plaintiff Larry Poore ("Poore") is a resident and citizen of Muncie, Indiana. In 2008, he had a new Nordyne HVAC unit installed at a single-family residence he owns in Bradenton,

Florida. On August 14, 2014, Poore called a technician from his original Nordyne authorized/distributor installer to his residence to determine why the unit was not cooling properly. The technician found a leak in the lower left quadrant of the evaporator coil assembly. This coil, which was still under warranty, was defective (cracked or corroded) and leaking refrigerant. The evaporator coil assembly had to be completely replaced, with the service call, labor and refrigerant not covered by Nordyne's warranty. The total cost spent out-of-pocket by Poore was $1,895.00.

Plaintiff Steven Hill ("Hill") is a resident and citizen of Houston, Texas. On July 16, 2010, he had a new Nordyne HVAC unit which was manufactured under the Maytag brand name installed at his residence in Houston, Texas. The installation was made after an Armadillo Air representative made a presentation to Hill and recommended the Nordyne Product based on its superior quality and warranty. On August 28, 2014, Hill contacted his original Nordyne distributor/installer, who had a technician come to the residence to see why the unit was not cooling properly. The technician found that the "coil" was leaking refrigerant and had failed. He notified Hill that that the coil assembly needed to be replaced. Hill's service paperwork does not specify whether his evaporator coil failed or if his condenser coil failed. The Nordyne Product was still under warranty so the part was replaced under warranty, but Hill incurred $300.00 in associated costs to have the defective coil replaced.

Nortek manufactured HVAC units and provided a Limited Warranty for the residential HVAC units that covered only the cost of replacement parts. Nortek also states that the HVAC warranty excludes reimbursement for "the costs of labor and other incidental damages." (AC, Exh. 1). However, according to Plaintiffs, the labor costs and other damages which the consumer must pay are far from "incidental." AC ¶¶14, 17-19, 23, 26. Here, the diagnostic and

replacement labor costs paired with the costs of repeatedly replacing leaked refrigerant and increased energy bills from poorly functioning and defective HVAC units cost the Plaintiffs and class members hundreds or even thousands of dollars.

Although by June 2009, Nortek knew its HVAC Products had defective coils, it failed to notify consumers of this known defect. AC, ¶62 Fig. C. Nortek's Technical Service Bulletin TB09-122R issued to installers and dealers on June 18, 2009 stated: "Nordyne is aware that early evaporator coil failures are an issue . . .." AC, ¶62. Concurrently, Nortek allegedly knowingly misled Plaintiffs and other consumers about the quality of its HVAC units stating: "We are so confident in our product performance that we back it with the NuTone Quality Pledge . . .." AC, ¶72 Ex. A.

Nortek purportedly knowingly placed defective products on the market, did not warn consumers of known defects, and attempted to limit its financial exposure by failing to provide a remedy through its warranty for the actual cost to diagnose and repair the product when the defect manifests. Nortek likewise failed to take appropriate corrective action to fix defects, with the result that consumers are forced to spend hundreds or thousands of dollars to diagnose, repair or replace the products which left the manufacturing facility with the defect. AC, ¶7. Consumers would not have purchased the Nortek HVAC products had they known the truth about the defect beforehand.

According to Plaintiffs, the Nortek Products were materially defective. Specifically, the evaporator coils (inside coils) and the condenser/condensing unit (outside coils) that Nordyne used in its products were defectively designed and/or manufactured, resulting in the copper tubing in the coils prematurely corroding and/or developing holes or cracks, causing refrigerant

to leak from the coils and causing the Nortek Products to fail long before their expected useful life. AC, ¶53.4

Further, when Nortek manufactured the evaporator and condenser coils, they were defectively designed, manufactured and/or engineered such that the coils are too thin, prematurely corrode, crack, or otherwise fail under ordinary and expected conditions, and cannot withstand the high pressure of the refrigerant which flows between the two sets of coils (one inside, one outside) to do the "work" of the Nortek HVAC system. AC, ¶4. Although refrigerant should never leak during the expected life[4] of a properly designed and manufactured HVAC system, the Nortek Products leak, often shortly after installation.

As a result of Nortek's limited warranty for its defective products, Plaintiffs and other consumers are forced to expend significant sums of money for repairs—even when the product is still relatively new and "under warranty"—when their Nortek Products prematurely fail. Nortek claims in its warranty that its HVAC Products are "the most reliable heating and cooling equipment," and the Company is "confident in [their] product performance" AC, ¶72 Ex. A. However, even if Nortek's "parts only" warranty is not illegal as a matter of law, its insufficient limited remedy leaves consumers in a far worse position financially than if their defective HVACs had functioned as promised.

## **ANALYSIS**

There are 20 causes of action in the Amended Complaint. Plaintiffs brought this action on behalf of themselves and all members of the Classes against Defendants, alleging various claims, including breach of express warranty, breach of written warranty (Magnuson-Moss

---

[4] "The life expectancy of a central air conditioning unit or heat pump is generally about 15 years." AC, ¶46. Additionally, Nortek's own website asserts that "[h]omeowners only shop for heating and cooling equipment once every 15-20 years." AC, ¶65.

Warranty Act), negligence, strict liability and failure to warn, negligent failure to warn,[5] and unjust enrichment. The Tennessee Plaintiffs individually and on behalf of the Tennessee class brought claims for breach of express warranty and breach of warranty of merchantability. The Georgia Plaintiff individually and on behalf of the Georgia Class brought claims under the Georgia Uniform Deceptive Trade Practices Act, breach of express warranty, and breach of implied warranty of merchantability. The Florida Plaintiff individually and on behalf of the Florida Class brought claims under the Florida Deceptive and Unfair Trade Practices Act, breach of express warranty, and breach of implied warranty of merchantability. The Texas Plaintiff individually and on behalf of the Texas Class brought claims under the Texas Deceptive Trade Practices Act, breach of express warranty, and breach of implied warranty of merchantability. Defendants filed a Motion to Dismiss requesting dismissal of all claims.

## I. Standard of Review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009)). " 'A legal conclusion couched as a factual allegation,' " however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." *Id*. (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929

---

[5] Plaintiffs conceded that the Economic Loss Doctrine bars their tort claims (Causes of Action Five, Six, and Seven) and voluntarily dismissed those claims. *See* (Docket Entry No. 75 at 1, Response to Motion to Dismiss).

8

(2007)). Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008) (citation omitted).

## II. Application of Law

### A. Jurisdiction

Defendants argue that the requirements of personal jurisdiction and venue are not satisfied with respect to the claims of the Florida, Texas, and Georgia Plaintiffs and those claims should be dismissed. (Docket Entry No. 58 at 24).

"There are two kinds of personal jurisdiction within the Federal Due Process inquiry: (1) general personal jurisdiction, where the suit does not arise from defendant's contacts with the forum state; and (2) specific jurisdiction, where the suit does arise from the defendant's contacts with the forum state." *Conn v. Zakharov*, 667 F.3d 705, 712–13 (6th Cir. 2012). A demonstration of the contacts necessary for either basis is sufficient to establish personal jurisdiction. *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003).

"In a diversity action, the law of the forum state dictates whether personal jurisdiction exists, subject to constitutional limitations." *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). "A court's exercise of personal jurisdiction over a nonresident defendant is appropriate only if it meets the state's long-arm statute and constitutional due process requirements." *Id.* Tennessee's long-arm statute provides that a Tennessee court may exercise jurisdiction over an out-of-state defendant on "[a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20–2–214(a)(6); *see also* Tenn. Code Ann. § 20–2–225(2) (same). Accordingly, the long-arm statute has been consistently construed

to extend to the limits of federal due process. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003). Thus, the two inquiries are merged, and the Court here need only determine whether exercising personal jurisdiction over the defendants is consistent with federal due process requirements. *Bridgeport*, 327 F.3d at 477. In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, the defendant must have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn*, 324 F.3d at 417 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

General jurisdiction requires the defendant to have "continuous, substantial, and systematic" contacts with the forum State. *Daimler AG v. Bauman*, 134 S.Ct. 746, 769 (2014). The defendant's "affiliations with the State [must be] so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *International Shoe*, 326 U.S. at 317). General jurisdiction allows a plaintiff to sue a defendant "on any and all claims against it, wherever in the world the claims may arise." *Daimler*, 134 S.Ct. at 751. As the Supreme Court has cautioned, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.'" *Id*. at 760 (quoting *Goodyear*, 564 U.S. at 924)).

Defendants contend that Plaintiffs have failed to make a *prima facie* showing of general jurisdiction. Specifically, they assert, "general jurisdiction does not exist in this matter" because "none of the Defendants are either incorporated in Tennessee or maintain a principal place of business in Tennessee" – nor have they "pled any facts or circumstances – let alone any

10

'exceptional circumstances' – that warrant departure from the []rule that general jurisdiction exists . . ." (*Id*. at 24-25).

Plaintiffs argue that personal jurisdiction is "not at issue" because they have all consented to the Court's jurisdiction and there are no jurisdictional requirements as to absent class members. (Docket Entry No. 76 at 19).[6] Specifically, as to general jurisdiction, Plaintiffs claim they have demonstrated it by alleging Nortek Internal, Inc. maintains a distribution and manufacturing facility in Dyersburg, Tennessee. Plaintiffs further argue that given the existence of the facility in Tennessee as well as its "continuous and systematic contacts with the state through the sale of its products to Tennessee consumers including the Bauers," this Court may exercise general jurisdiction. (*Id*. at 11).

The Court agrees with Defendants that it does not have general jurisdiction over Defendants with respect to the claims of the Florida, Texas, and Georgia Plaintiffs. Here, Nortek, Inc. is neither incorporated nor maintains its principal place of business in Tennessee. Nortek indeed has a presence in Tennessee with its distribution and manufacturing facility in Dyersburg. However, Plaintiffs have not provided facts suggesting that Nortek's affiliation with Tennessee is "so continuous and systematic as to render" it at home in Tennessee. Moreover, the Supreme Court has made it clear that the mere presence of a defendant in the forum does not subject it to all-purpose jurisdiction in that forum. *See, Daimler,* 134 S.Ct. at 752, 762 (finding no general jurisdiction over a foreign corporation where subsidiary, whose actions were assumed attributable to the corporation, had multiple facilities and a regional office in the forum state). Therefore, Plaintiffs have failed to make out a *prima facie* case of personal jurisdiction.

---

[6] This argument is misplaced. Defendants are not making the argument that the Court lacks jurisdiction over Plaintiffs or absent class members. Rather, Defendants assert that Court does not have "personal jurisdiction over Defendants with respect to the claims of the Florida, Georgia and Texas Plaintiffs." (*Id.* at 8).

Next, Defendants claim that Plaintiffs have also failed to make a *prima facie* showing of specific jurisdiction with respect to the claims of the Florida, Georgia and Texas Plaintiffs. (Docket Entry No. 58 at 9). The assertion of specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy," such as an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919. Unlike general jurisdiction, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* For a court to exercise specific jurisdiction over a defendant, the plaintiff must satisfy the three-part *Mohasco* test established by the Sixth Circuit for determining whether the exercise of specific jurisdiction is consistent with the principles of due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Industs., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

Defendants further contend that the claims alleged by these Plaintiffs do not arise out of or relate to Defendants' contacts with Tennessee, as their units were purchased and installed in their respective Florida, Georgia, and Texas Home States. Moreover, Defendants argue that no allegation is made that the Florida, Georgie, or Texas Plaintiffs purchased their HVAC units in Tennessee or had any contact with any Defendant in the State of Tennessee. (*Id*. at 10). Plaintiffs did not rebut this argument in their response brief. As such, Plaintiffs have forfeited this argument. *See*, *Rautu v. U.S. Bank*, 557 Fed. App'x 411, 415 n.4 (6th Cir. 2014).[7] Even if

---

[7] As noted in Defendants' brief, the personal jurisdictional argument does not apply to the Tennessee Plaintiffs. *See* (Docket Entry Nos. 56 at 8; 79 at 2).

Plaintiffs had attempted an argument, it would have presumably failed because the Amended Complaint does not offer any factual allegations that the out-of-state Plaintiffs had any dealings with the Defendants in the State of Tennessee. Accordingly, The Court concludes that specific jurisdiction in this case is not proper for the Florida, Georgia, and Texas Plaintiffs. As there is no general or specific jurisdiction over Defendants with respect to the Florida, Georgia, and Texas Plaintiffs' claims, those Plaintiffs and the classes they represent will be dismissed.[8] The Court will now proceed with the parties' arguments as they relate to the Tennessee Plaintiffs and the classes they represent.[9]

### B. Statute of Limitations

Defendants claim that the statute of limitations precludes all of the claims brought by the Tennessee Plaintiffs. (Docket Entry No. 58 at 13). In support Defendants argue the breach of warranty claims are barred by Tenn. Code Ann. § 47-2-725(1)-(2).[10] Further, Defendants contend the unjust enrichment claim is similarly subject to Tennessee's four-year statutory period for warranty claims because, here, the unjust enrichment claim is based on the same alleged conduct underlying the warranty claims, and thus should be subject to the same statutory period; Plaintiffs concur. Defendants argue that under Tennessee law, the four-year statutory

---

[8] Because Plaintiffs' venue arguments are predicated on their argument that the Court has personal jurisdiction over the Defendants, their venue arguments similarly fail. *See* (Docket Entry No. 72 at 12).

[9] This leaves the following causes of action on behalf of the Tennessee Plaintiffs and members of the alleged nationwide classes: Count I declaratory relief, Count II injunctive relief, Count III breach of express warranty, Count IV breach of written warrant (Magnuson-Moss Warranty Act), and Count VIII unjust enrichment. Tennessee Plaintiffs and on behalf of Tennessee class Count VIIII Breach of express warranty and Count X Breach of Implied Warranty.

[10] They further assert that a breach of warranty under the Magnuson-Moss Warranty Act ("MMWA"), as alleged in Count IV, is also subject to Tennessee's four-year statutory period for warranty claims because "courts borrow the most closely analogous state statute of limitations" when evaluating claims under the MMWA. *Highway Sales, Inc. v. Blue Bird Corp.*, 559 F.3d 782, 789 n.6 (8th Cir. 2009). (*Id.*). Plaintiffs do not dispute this assertion.

13

period for each of these claims began to run upon tender of delivery of the Plaintiffs' HVAC units. (*Id*.). Citing *Paskell v. Nobility Homes, Inc.*,[11] Defendants argue that the Tennessee Supreme Court has held that "a warranty to merely 'repair is not one that explicitly extends to future performance of the goods.'" (*Id*.). Further, they continue, "thus, where the warranty 'is clear that it covers . . . only repairs made necessary due to defects in material or workmanship,' the warranty is one that 'would be breached on tender of delivery,'" citing *Poppenheimer v. Bluff City Motor Homes*, 658 S.W.2d 106, 111 (Tenn. Ct. App. 1983). Defendants maintain that the terms of the Limited Warranty make clear that it only covers repairs: "If any part fails due to a defect in material or workmanship within the Warranty Period …, a replacement part will be provided free of charge …. THERE ARE NO OTHER EXPRESS WARRANTIES." (*Id*.)(citing Am. Compl., Ex. A (Limited Warranty) (emphasis in original). Thus, according to Defendants, the Tennessee Plaintiffs' claims accrued upon tender of delivery in 2009. (*Id*. at 14-16).

Defendants' "Limited Warranty Quality Pledge" provides, in pertinent part:

**NuTone**
**Limited Warranty Quality Pledge**

Congratulations on your decision to purchase the most reliable heating and cooling equipment. We are so confident in our product performance that we back it with the **NuTone** Quality Pledge:

*If the Compressor in your **NuTone** outdoor cooling unit fails to operate during the first ten years of ownership, under normal use and due to a defect in materials or workmanship, **NORDYNE** will replace the outdoor unit only.

\*\*\*

**TEN YEAR LIMITED WARRANTY FOR SITE-BUILT RESIDENTIAL USE ONLY**

If any part fails due to a defect in material or workmanship within the Warranty Period (defined below), a replacement part will be provided free of charge except for the freight costs which are the owner's responsibility. **NORDYNE** will not

---

[11] 871 S.W.2d 481, 483 (Tenn. 1994).

pay for parts purchased in the field from other than a **NuTone** distributor. The owner is responsible for all labor charges. Replacement parts are warranted only for the balance of the original Warranty Period. The "Warranty Period" is 10 years (except for heat exchangers which carry a limited lifetime warranty and "E" Series compressors, in unmatched systems which carry a 5 year warranty) from the later of the date of original installation or when the residence is first occupied, if properly documented; otherwise the 10 year period commences on the date of shipment from NORDYNE, plus sixty days. **In order to be eligible for coverage under this warranty, you must register within 60 days of the later of installation or occupancy. If registration is not completed within 60 days the Warranty Period reverts to:**

**5 year parts, 5 year compressor, 20 year heat exchanger**

(Docket Entry No. 42-1). Plaintiffs argue that the Limited Warranty is a "performance warranty" and therefore the statute of limitations for their warranty claims is triggered upon discovery of the alleged breach, rather than delivery of their HVAC units. (Docket Entry No. 76 at 16). Plaintiffs further contend,

> In this case, Nortek's express warranty language states that "[i]f any part fails due to a defect in material or workmanship within the Warranty Period . . ., a replacement part will be provided free of charge . . ." AC, ¶74; Ex. A. Specifically, the warranty states: "We are so confident in our *product performance* that we back it with the NuTone Quality Pledge . . ." AC, ¶¶72-73; Ex. A (emphasis added). Here, "we back it" can only be interpreted as Nortek's explicit statement about its HVAC Product's performance. In addition, at least twice the warranty states that if a part "*fails to operate*," it will be replaced. AC, ¶72; Ex. A (emphasis added). Nortek contends that "the terms of the Limited Warranty make clear that it only covers repairs." Mot. At 15. However, its plain language shows it is clearly a performance warranty, and thus not limited by the four-year statute of limitations.

(Docket Entry No. 76 at 16). Additionally, Plaintiffs contend that Nortek's argument regarding the statute of limitations would "lead to the illogical result that a consumer" with a valid warranty would be precluded from bringing any breach of warranty claim as soon as the statute of limitations expires, despite holding a valid express warranty from the manufacturer. (*Id*.). Plaintiffs continue, "[b]y Nortek's self-serving interpretation, all 5-year, 10-year or even lifetime

15

warranties mutate into 4-year warranties, with many consumers only becoming aware of the reduction of their longer, bargained-for express warranties after they had expired." (*Id*.).

The Tennessee statute that is relevant to this issue and discussed by the parties, states, in pertinent part:

§ 47-2-725. Statute of limitations in contracts for sale

(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Plaintiffs' arguments that Defendants' warranty is a performance warranty under Tenn. Code Ann. §47-2-725, so that the limitations period would not begin to run until later are unavailing. According to Plaintiffs, the phrase "'we back it with the NuTone Quality Pledge'… can only be interpreted as [NGH's] explicit statement about its HVAC Product's performance." (Docket Entry No. 76 at 16). But Plaintiffs' interpretation is contrary to the plain terms of the NuTone Quality Pledge, which applies only to compressors and heat exchangers, not evaporator or condenser coils. A limited warranty, like the one offered by Defendants in this case, that contemplates repair or replacement in the event of "defects in workmanship and materials… is not one that explicitly extends to future performance of the goods." *Poppenheimer v. Bluff City Motor Homes, Div. of Bluff City Buick Co.*, 658 S.W.2d 106, 111 (Tenn. Ct. App. 1983). The exception is "construed narrowly, and courts have been 'very harsh in determining whether the warranty explicitly extends to future performance.'" *Standard Alliance Indus., Inc. v. Black*

*Clawson Co.*, 587 F.2d 813, 820 (6th Cir. 1978). The proper question is whether the statute of limitations is meant to run from the day of delivery or from the day when a defect is found sometime in the future. *Id.* The Tennessee statute is clear that a cause of action accrues upon delivery, except where a warranty "explicitly extends to future performance." Tenn. Code Ann. §47-2-725(2). The NuTone Quality Pledge – along with the Limited Warranty (which does apply to coils) – explicitly contemplates the possibility that a part may "fail[]… due to a defect in materials and workmanship" and provides for NGH's replacement obligations in the event of such failure. (Docket Entry No. 42-1).[12] The plain language of the Limited Warranty does not unconditionally guarantee the HVAC unit or its component parts, but rather presumes there may be failures that will require replacement. Thus, under the law, it does not extend to future performance.

As stated *supra*, the Tennessee Plaintiffs had the Nordyne NuTone Split Unit installed in their home in June 2009. Plaintiffs had four years – until July 2014 – to file their lawsuit. Unfortunately, they did not file until October 2014. Thus, the Tennessee Plaintiffs' remaining claims accrued upon "tender of delivery" and are barred by the four-year statute of limitations. Tenn. Code Ann. § 47-2-725(1)-(2).[13]

---

[12] The court notes that Plaintiffs have made the admission that Defendants did replace the alleged defective evaporator coil with a new part under their limited warranty. (AC,, ¶13).

[13] Because these claims have been dismissed as to the Tennessee Plaintiffs, they cannot be maintained on behalf of the putative class. *See* Fed. R. Civ. P. 23(a)(3) (requiring that the claims of the representative plaintiffs be typical of the claims of the class); *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (holding that Rule 23(a)(3) requires that the named plaintiffs' claims be "'based on the same legal theory'" as the class claims) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13 (3d ed. 1992)). Consequently, the claims brought on behalf of the putative class will be dismissed and the pending motions to strike the class actions will be denied as moot.

## **CONCLUSION**

For all of the reasons stated, Defendants' *Motion to Dismiss Plaintiffs' Amended Complaint* (Docket Entry No. 57) will be granted. Accordingly, Defendants' *Motion to Strike the Nationwide Class Allegations in Plaintiffs' Amended Complaint* (Docket Entry No. 46) and *Motion to Strike State Class Allegations in Plaintiffs' Amended Complaint* (Docket Entry No. 59) will be denied as moot.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE